ACCEPTED
04-14-00180-CR
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
12/28/2014 11:44:28 PM
KEITH HOTTLE
CLERK

## NO. 04-14-00180-CR

**IN THE COURT OF APPEALS
FOR THE FOURTH JUDICIAL DISTRICT
SAN ANTONIO, BEXAR COUNTY, TEXAS**

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
12/29/2014 2:23:00 PM
KEITH E. HOTTLE
Clerk

**LEONARDO RIVAS
APPELLANT**

**VS.**

**STATE OF TEXAS,
APPELLEE**

**APPEAL FROM THE 38TH JUDICIAL DISTRICT COURT
OF MEDINA COUNTY, TEXAS, CAUSE NO. 12-04-10954-CR**

**THE HONORABLE CAMILE G. DUBOSE, PRESIDING**

**BRIEF OF APPELLEE, STATE OF TEXAS**

**Submitted by:**

**DANIEL J. KINDRED
38TH JUDICIAL DISTRICT ATTORNEY
MEDINA COUNTY, TEXAS**
3102 Avenue G
Hondo, Texas 78861
Telephone: (830) 741-6188
Facsimile: (830) 741-6033

By:_____

    **CHRISTINA BUSBEE**
    State Bar No. 00797819
    **ASSISTANT DISTRICT ATTORNEY**

**ORAL ARGUMENT NOT REQUESTED**

i

## IDENTIFY OF THE PARTIES AND COUNSEL

The following is a complete list of all parties at the trial court as well as the names of all trial and appellate counsel.

### Parties

Appellant                                                                   Appellee

**LEONARDO RIVAS**                                              **STATE OF TEXAS**

### Trial Counsel

Honorable Humberto Saldana
State Bar No. 24026460
Attorney at Law
719 South Flores Street
San Antonio, Texas 78204


**ATTORNEY FOR DEFENDANT**

Honorable Daniel J. Kindred
38th Judicial District Attorney
State Bar No. 24010682
Honorable Christina Busbee
Assistant District Attorney
Border Prosecutor
State Bar No. 00797819
3102 Avenue G
Hondo, Texas 78861
Honorable Mark D. Kimball
Regional 2 Counsel
Border Prosecution Unit
State Bar No. 11418030
1901 Bob Bullock Loop
Laredo, Texas 78043

**ATTORNEYS FOR STATE**

### Appellate Counsel

Honorable Dayna L. Jones
State Bar No. 24049450
Law Office of Dayna L. Jones
206 E. Locust
San Antonio, Texas 78212


**ATTORNEY FOR APPELANT**

Honorable Daniel J. Kindred
State Bar No. 24010682
38th Judicial District Attorney
Honorable Christina Busbee
State Bar No. 00797819
Assistant District Attorney
Border Prosecutor
3102 Avenue G
Hondo, Texas 78861

**ATTORNEYS FOR APPELLEE**

# TABLE OF CONTENTS

PARTIES …………………………………………………………………………………………ii

TABLE OF CONTENTS……………………………………………………………...……iii

INDEX OF AUTHORITIES…………………………………………………………………v

STATEMENT OF THE CASE………………………………..……………………………...1

ISSUES PRESENTED……………………………..…………………………………......1

STATEMENTS OF FACTS………………………………………………………………2

SUMMARY OF THE ARGUMENT………………………………………………………...11

ARGUMENT AND AUTHORITIES……………………………………………………14

ISSUE NUMBER ONE………………………………………………………………………14

**THE TRIAL COURT DID NOT ERR IN DENYING THE APPELLANT'S REQUEST FOR A JURY CHARGE ON SUDDEN PASSION DURING PUNISHMENT**

ISSUE NUMBER TWO…………………………………………………………………..21

**THE EVIDENCE IS SUFFICIENT TO SUPPORT CONVICTION FOR CONSIRACY TO COMMIT MURDER**

ISSUE NUMBER THREE……………………………………………………………………….27

**THE STATE DID NOT USE PERJURED TESTIMONY TO CONVICT APPELLANT**

ISSUE NUMBER FOUR……………………………………………………………………….30

**THE TRIAL COURT DID NOT ERR IN SUSTAINING THE STATE'S "SPECULATION" OBJECTION WHEN APPELLANT ATTEMPTED TO ELICIT TESTIMONY FROM THE WITNESS, JULIANA JASO**

PRAYER…………………………………………..………………………………………..35

CERTIFICATE OF SERVICE……………………………………………………………….35

# INDEX OF AUTHORITIES

FEDERAL CASE LAW                                                                                    Page

*Jackson v. Virginia.  Jackson v. Virginia,* 443 U. S. 307 (1979)………….……...................... 21, 22

STATE CASE LAW

*Burnett v. State*, 112 S.W. 74 (Tex. Crim. App. 1908)………………………………………………32

*Cawley v. State,* 310 S. W. 2d 340 (Tex. Crim. App. 1957)…………………………………………..26

*Celis v. State,* 369 S. W. 3d 691 (Tex. App. – Fort Worth 2012, pet. ref'd)………….…..30, 33-35

*Chavez v. State,* 6 S. W. 3d 56 (Tex. App. – San Antonio 1999, pet ref'd)……………………20

*Clayton v. State,* 235 S. W. 3d 772 (Tex. Crim. App. – 2007)………………………………..…21

*Coleman v. State,* 545 S. W. 2d 831 (Tex. Crim. App. 1977)……………………………....32, 34

*Cox v. State,* 830 S. W. 2d 609 (Tex. Crim. App. – 1992)……………………………………22

*Cueva v. State,* 339 S. W. 3d 839 (Tex. App. – Corpus Christi 2011, pet. ref'd)………………..26

*Daniels v. State,* 645 S. W. 2d 459 (Tex. Crim. App. 1983)…………………………………...17, 19

*Dowthitt v. State,* 931 S. W. 2d 244 (Tex. Crim. App. – 1996)………………….………………22

*Farrakhan v. State,* 263 S. W. 3d 124 (Tex. App. – Houston [1st Dist.} 2006, no pet.)…12, 29-30

*Gilstraip, v. State,* 945 S. W. 2d 192 (Tex. App. – Fort Worth 1997, writ ref'd)…………...14, 34

*Green v. State*, 111 S.W. 933 (Tex.Crim.App.1908)………………………………….………32

*Grismore v. State,* 641 S. W 2d 593 (Tex. App. – El Paso 1982, no writ)…....………………..13, 30

*Gonzales v. State,* 717 S. W. 2d 355 (Tex. Crim. App. 1986)………….………………………… 16

*Hanner v. State,* 572 S. W. 2d 702 (Tex. Crim. App. 1978)………….…………………14, 34

*Hobson v. State,* 644 S. W 2d 473 (Tex. Crim. App 1983)…………………………………11, 17

*Holmes v. State,* 323 S. W. 3d 163 (Tex. Crim. App. – 2009)…..………………………17, 33

*In Re Davila,* 631 S. W. 2d 723 (Tex. Crim. App. 1982)……………………………12, 29, 30

*McKinney v. State,* 179 S. W. 3d 565 (Tex. Crim. App. 2005)………..………………11, 16, 17

*Mitchell v. State,* 191 S. W. 3d 219 (Tex. App. – San Antonio, 2005, pet ref'd)………………..19

*Rovinsky v. State,* 605 S. W. 2d 578 (Tex. Crim. App. 1980)……………………………..14, 35

*Powell v. State,* 194 S. W. 3d 503 (Tex. Crim. App. – 2006)……………………………21, 22, 26

*Samuels v. State,* 785 S. W. 2d. 882 (Tex. App. – San Antonio 1990, writ ref'd.)………..……19

*Torres v. State,* 794 S. W. 2d 596 (Tex. App. -  Austin 1990, no pet.)…………………..……26

*Trevino v. State* 100 S. W. 3d 232 (Tex. Crim. App. 2003)…………………………………. 20

*Turner v. Collie & Braden, Inc. v. Brookhollow, Inc.,* 624 S. W. 2d 203 (Tex. App. – Houston

[1st Dist. 1981]……………………………………………………………………………13, 34

*Wooten v. State,* 400 S. W. 601 (Tex. Crim. App. 2013)………………...…11-12, 15-16, 18-20

STATE STATUTUES

Tex. Penal Code Ann. § 15.02 (a) (Vernon 2011)…………………………………………….22

Tex. Penal Code Ann. § 15.02 (b) (Vernon 2011)…………………………………………….22

Tex. Penal Code Ann. § 19.02 (a) (1) (Vernon 2011)…….……………..……………………15

Tex. Penal Code Ann. § 19.02 (a) (2) (Vernon 2011)…………………….…………………..15

Tex. Penal Code Ann. § 19.02 (d) (Vernon 2011)…….……………..………………14, 15

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to the Texas Rules of Appellate Procedure, the Appellee does not request oral argument in this case.

## STATEMENT OF THE CASE

The Appellant was indicted on April 10, 2012, in Cause Number 12-04-10954-CR with the offense of murder and in Cause No. 12-04-10955-CR with the offense of aggravated assault with a deadly weapon alleged to have occurred on the 15th day of October 2011 (I C. R. at 8-9, I C. R at 7-8). The appellant was indicted on May 7, 2012 in Cause No. 12-04-10993-CR with the offense of criminal conspiracy alleged to have occurred on the 15th day of October 2011 (I C. R at 7-8). [1] These indictments were consolidated by the trial court on April 1, 2013 (I C. R. at 30). The Appellant was consolidated for trial with the co-defendant, Michael Rivas, on August 6, 2013, under Cause No. 12-04-10954-CR (I C. R. at 35). The Appellant was tried on all three indictments beginning on January 13, 2014, before a jury (IV R. R. at 1). On January 22, 2014, the jury returned a verdict of guilty on all three indictments (IX R. R. at 78). On January 23, 2014, the jury assessed punishment of life in the Texas Department of Corrections on the murder charge, twenty (20) years of confinement in the Texas Department of Corrections on the aggravated assault with deadly weapon charge and twenty (20) years of confinement in the Texas Department of Corrections on the criminal conspiracy charge. No fine was assessed by the jury (X R. R. at 35-38).

There was no motion for new trial filed by the appellant.

---

[1] Appellee notes that it received multiple volumes of the clerk's record, all identified as Volume I so that it has no way of differentiating the different volumes.

ISSUES PRESENTED

ISSUE NUMBER ONE

**THE TRIAL COURT DID NOT ERR IN DENYING THE APPELLANT'S REQUEST FOR A JURY CHARGE ON SUDDEN PASSION DURING PUNISHMENT**

ISSUE NUMBER TWO

**THE EVIDENCE IS SUFFICIENT TO SUPPORT CONVICTION FOR CONSIRACY TO COMMIT MURDER**

ISSUE NUMBER THREE

**THE STATE DID NOT USE PERJURED TESTIMONY TO CONVICT APPELLANT**

ISSUE NUMBER FOUR

**THE TRIAL COURT DID NOT ERR IN SUSTAINING THE STATE'S "SPECULATION" OBJECTION WHEN APPELLANT ATTEMPTED TO ELICIT TESTIMONY FROM THE WITNESS, JULIANA JASO**

**STATEMENT OF FACTS**

On or about October 14, 2011, the appellant, Leonardo "Lenny" Rivas, his brother, Michael "Mikeo" Rivas, and Adriana Benavides were hanging out together that day in Adriana's parents' black Expedition. Michael Rivas had only been out of the Texas Department of Corrections Substance Abuse Facility for three (3) days and Leonard Rivas was on pre-trial release for a charge of manufacture delivery of a controlled substance, 4-200 grams by the 38th Judicial District Court (VIII R. R. at 20-21, IX R. R. at 114-119, XII). On October 14, 2011, Johnny Joe Flores, Margie Gonzales and Janie Aguilar began a 2:00 p.m. to 1:00 a.m. shift at Villa's Restaurant in Hondo, Texas (IV R. R. at 28, 155, VII R. R. at 143). Michael Rivas, Adrianna Benavides and the appellant had dinner at Villa's restaurant at approximately 5:30 p.m. (IV R. R. at 45, 163, 197, VII R. R. at 211). Later on October 14, 2011, Michael Rivas, Adriana

2

Benavides and appellant went to H.E.B. to buy some beer and then they went to a birthday party at 2300 Cedar Street in Hondo, Texas (VII R. R. at 5-11, 212-213). While at the party on Cedar Street, Michael Rivas and Adriana Benavides received calls and text messages from Eusebio "Chevio" Luna (VII R. R. at 10, 214-215). Eusebio "Chevio" Luna was a member of the Mexican Mafia (VI R. R. at 194). Chevio wanted to talk to Adriana Benavides and Michael Rivas about cocaine that Chevio believed had been stolen by Adriana (VII R. R. at 10, 222). Adriana Benavides and Michael Rivas left the party on Cedar Street and along, with Adrienne Lopez, drove in the black Expedition to a park on 18th Street in Hondo, Texas, to meet with Chevio Luna (VII R. R. at 12-13, 222). This park was right across the street from a house that belonged to Armando Garcia. When they arrived there were a number of people outside of the house across the street from the park (VII R. R. at 13). It was common knowledge that a number of people lived at the house on 18th Street across from the park and that a number of people congregated there (VIII R. R. at 11-12, 110-111). Standing outside of the house when Michael Rivas, Adriana Benavides and Adrienne Lopez arrived was Chevio Luna. When they arrived at the park on 18th street, Adrienne Lopez got off the Expedition and went across the street inside the house (VII R. R. at 13, 17). At first, Chevio and Michael Rivas engaged in an argument, but at some point the argument ceased and the parties looked like they were shaking hands (VII R. R. at 14-15). At that point, Adriana Benavides exited the vehicle (VIII R. R. at 111). After that, a white van drove up and the victim, Felix "Chape" Flores, got off the van (VII R. R. at 40). Chape was seen to have something behind his back and in his hand (VII R. R. at 40). Michael Rivas stepped back from Chape, but then stepped forward and started fighting (VII R. R. at 16). A fight ensued between Michael Rivas and Felix Flores and a number of additional males. Michael Rivas did not have a weapon with him at the fight on 18th Street (VII R. R at 44,

3

47, 52, 230).  Michael Rivas punched Felix Flores and knocked him down (VII R. R. at 16, VIII R. R. at 34).  After the fight was over, Michael Rivas took off running down 18th street and Adriana Benavides got back into the Expedition, drove after Michael Rivas and picked him up about a block away from the location of the fight (VII R. R. at 17, 44).   Adrienne Lopez stayed at the house on 18th Street, intoxicated and throwing up (VII R. R. at 112).  When Michael Rivas and Adriana Benavides were leaving 18th Street, the white van driven by Felix Flores followed them for about a block (VII R. R. at 44, 90).  Michael Rivas got back into the black Expedition with Adriana Benavides and went back to the party on Cedar Street (VII R. R. at 18, VIII R. R. at 111-112).  Michael Rivas did not have any injuries that required medical attention and he was laughing about his injuries (VII R. R. at 94).   Michael Rivas and Adriana Benavides waited at the party on Cedar Street until the appellant returned to the party (VII R. R. at 19).  Once the appellant returned to the party on Cedar Street, Michael Rivas told the appellant about the fight on 18th Street (VI R. R. at 227-229).  Michael Rivas told the appellant "If you're down to roll, let's ride."  At first, the appellant told Michael Rivas "No" (VI R. R. at 264-265).  The appellant then told Michael Rivas "Fuck them.  I already told these mother fuckers they are not going to fuck with us.  Fuck that bro, Fuck that shit.  I am tired of their shit" (VI R. R. at 228, 265-266).  Michael Rivas told the appellant "Fuck that.  Let's go get them" (VI R. R. at 266).  Immediately before Michael Rivas, Adriana Benavides and the appellant departed the party on Cedar Street, the gun was heard to have been "racked" (by pulling back the chamber of the gun) (VI R. R. at 253).  The appellant was seen to retrieve the gun and Michael Rivas was also seen with the gun (VI R. at 253, VII R. R. at 20).  When they drove off around 1:00 a.m. from Cedar Street, Adriana Benavides was in the driver's seat, but the parties stopped the vehicle and switched seats so that Michael Rivas was driving while Adriana Benavides was in the rear passenger seat (VI R.

4

R. at 254, VII R. R. at 21). The appellant was in the front passenger seat (VI R. R. at 255). After leaving Cedar Street, Michael Rivas, Adriana Benavides and the appellant drove down 11th Street where they saw a police officer. Michael Rivas pulled into a driveway and Adriana Benavides got off the car and pretended to be visiting someone at a house on 11th Street in an effort to evade the police and to appear as if they were not engaged in any type of criminal activity (VII R. R. at 22-24, 246, VIII R. R. at 14). While they were stopped at this residence, the appellant told Michael Rivas, "I'm going to make you a believer" (VII R. R. at 22). Later on before arriving at 1406 12th Street, the appellant told Michael Rivas that he "might know where the guy (Felix Flores) would be" (VII R. R. at 91).

At approximately 12:45 a.m., Felix Flores went to Villa's restaurant and had a brief conversation with his brother Johnny Joe Flores who was about to end his shift. Felix Flores was supposed to go get cigarettes and then meet his brother, Johnny Joe Flores, his sister-in-law, Margie Gonzales, and Felix's girlfriend, Janie Aguilar, back at their house at 1406 12th Street (IV R. R. at 29-30, 87, 156, 182, VII R. R. at 143). Johnny Joe Flores and Margie Gonzales had lived at 1406 12th Street in Hondo, Texas, for 9 years. Appellant was aware of where the victims lived (IV R. R. at 34, 99, 216). Felix Flores arrived at 1406 12th Street at approximately 1:15 a.m. (IV R. R. at 62, VII R. R. at 145). When he arrived, he had a bump on the top of his right eye that had not been there earlier when he had come by the restaurant (IV R. R. at 33, 58-59,162, 183, V R. R. at 15, VI R. R. at 145, VII R. R. at 188). At the time Felix Flores arrived at 1406 12th Street, Johnny Joe Flores, Margie Gonzales and Janie Aguilar were unwinding after work. They were eating tacos that they had brought home and were resting on a cement slab right outside of their mobile home (IV R. R. at 32, 157, VII R. R at 144). Margie Gonzales had also brought a taco for Felix to eat and had given it to him (IV R. R. at 162, 187). Felix told

5

Johnny Joe Flores, Janie Aguilar and Margie Gonzales about the previous altercation on 18th Street whereat he said that he had been "jumped." Felix never expressed any intention of extracting revenge on Michael Rivas or the appellant (IV R. R. at 87, 90, 187, 204, 211, VII R. R. at 190-191). Felix Flores was at 1406 12th Street for approximately ten minutes eating his taco when Michael Rivas, the appellant and Adrianna Benavides drove up in the black Expedition (IV R. R. at 35, VII R. R. at 151). Michael Rivas was still in the driver's seat, appellant in the front passenger seat and Adrianna Benavides in the back passenger seat (IV R. R. at 36.) Michael Rivas stopped the black Expedition three to four feet short of the stop sign in front of the mobile home and parked close to the property line (IV R. R. at 35-36, 64, 188). At the time the appellant and Michael Rivas drove up to 1406 12th Street, the victims, including Felix Flores, were approximately 11 feet from the property line, inside of their yard standing and sitting on the concrete slab eating their tacos (IV R. R. at 64, 162, 211, VI R. R. at 167). When the black Expedition drove up, a male voice was heard saying "That's him" (IV R. R. at 97, 190) Upon seeing Michael Rivas and the appellant, Felix Flores said to his brother "That's them," put his hands up in the air and yelled in Spanish "Que Onda" which means "what's up" and then took approximately two and a half steps (IV R. R. at 36-37, 68-69, 166, 190, VII R. R. at 26, 52, 147, 150-151). The appellant then pretended like he was going to open the door of the vehicle, but instead started firing a weapon outside of the Expedition at Felix Flores (IV R. R. at 36, 167, 192-193, VII R. R. at 27, 149, 185, VIII R. R. at 78). Felix Flores was shot nine (9) times where he stood and fell to the ground near the concrete slab close the mobile home (IV R. R. at 38, 80, 193, 247, VI R. R at 86, VII R. R. at 52). During the shooting, Johnny Joe Flores pushed his wife Margie Gonzales out of the way and was shot in his upper right thigh (IV R. R. at 38, 40). Michael Rivas and the appellant testified that the appellant was the sole shooter, however, other

6

witnesses testified that they believed at some point the appellant stopped shooting, Michael Rivas grabbed the gun and reinitiated the shooting (IV R. R. at 39, 172-173, 194-195, VII R. R. at 50, 149, 169, 192). Janie Aguilar ran to the side of Felix Flores's white van to hide (IV R. R. at 40, VII R. R. at 152). At the time of the shooting, three sons of Johnny Joe flores and Margie Gonzales were inside of the mobile home along with their four grandchildren (IV R. R. at 40, 159). Felix Flores was unarmed at the time of the shooting, as were the other victims. There was not any weapons found at the crime scene (IV R. R. at 42, 169-171, 227, 234-235, V R. R. at 113, 128-129, VI R. R. at 12-13, 36, 103-104, 148-149, VII R. R. at 27, 30, 53, 148, 150). Felix Flores never traveled from where he was standing to where the Expedition was parked (IV R. R. at 207, VII R. R. at 51, 56-57, 150, 154, 195). There were no blood drops from the location where Felix Flores fell after being shot to the location where the Expedition was parked (V at R. R. at 91, 132, VI R. R. at 37, 103, 148). The witnesses testified that Felix Flores never struck anyone in the Expedition either with a weapon or with his fists (IV R. R. at 118, 169, VII R. R. at 31, 51). Johnny Joe Flores never made advances toward the vehicle and was shot when he was pushing his wife out of the line of fire (IV R. R. at 136, 169-170). The victim suffered nine gunshot wounds, the majority of which were at the chest area (IV R. R. at 10, 12, VII R. R. at 27, 52). Johnny Joe Flores suffered a gunshot to his leg, one bullet went through the vehicle parked at the residence and one bullet went through the children's bedroom (IV R. R. at 42, 44).

Appellant testified at the time the Expedition stopped at the stop sign in front of 1406 12th Street, Felix Flores approached his side of the vehicle and was swinging at him with his right hand and that somehow appellant was stabbed in his left hand (VIII R. R. at 51-52). Felix Flores was left handed (IX R. R. at 14).

After the shooting, Michal Rivas and the appellant drove to the appellant's mobile home on 11th Street. Appellant and Michael Rivas exited the Expedition, hugged each other and then ran off in different directions (VII R. R. at 243). Michael Rivas told Adriana Benavides to drive off and she refused to do it. It was only after Michael and the appellant ran off did she get back into the Expedition and then drove to her home (VII R. R. at 29). At all times, Adriana Benavides was with Michael Rivas and the appellant of her own free will and never made any attempt to get away (VII R. R. at 50).

The first Hondo Police officer to arrive on the scene was Ramiro Guedea, followed by Officer Brandon Teer, Officer John Dunkley, Sergeant Brian Valenzuela and Detective Sergeants Rick Garza and Jo Ann Evans (V R. R. at 86-87, 126, VI R. R. at 6-11, 144). The evidence revealed that casings to the weapon were found on the roadway in a location that would have been outside and to the right of the vehicle of where it had been parked (VI R. R. at 53, 54, 100-101). The distance from the concrete slab were the victims were standing and sitting at the time of the shooting to where the casings were located was approximately six feet to eleven feet (VI R. R at 100, 167). Officer John Dunkley was concerned that the casings would be disrupted when the EMS ambulance pulled up in front of the mobile home; consequently, Sergeant Valenzuela told Officer Dunkley to pick up some of the casings and then he told Sergeant Evans where they had been located (VI R. R. at 11, 53). There was no evidence found in the black Expedition that either Michael Rivas or the appellant had been injured or assaulted in any way. Nor was there any evidence of blood of the victim in the Expedition, despite the contention of the appellant that Felix Flores was right up against the passenger side window when the appellant shot him (VI R. R. at 153, VIII R. R. at 77). The appellant was apprehended in Bexar County on October 19, 2011. At the time of his arrest in Bexar County, there were no injuries to

8

his body, other than a small abrasion on the inside of his left hand (VI R. R. at 159-160). Michael Rivas was apprehended on October 22, 2014, in Bexar County (VI R. R. at 161). At the time of his arrest, Michael Rivas had no injuries to his body other than a small abrasion to the back of head and a scratch on his chest (VI R. R. at 163-165).

Michael Rivas testified that he had only been out of the Texas Department of Corrections Substance Abuse Facility for three (3) days when this incident occurred (VIII R. R. at 20-21). He also testified that he was previously a member of the Mexican Mafia until he was kicked out (VII R. R at 215-216). He testified that the appellant fired the shots at the house at 1406 12th Street (VII R. R. at 240). Michael Rivas testified that he never sought any medical attention for any injuries he suffered as a result of the altercation at 18th Street (VII R. R. at 245). Michael Rivas referred to the victim, Felix Flores, as just "another civilian" and the victim, Johnny Joe Flores, as an "innocent bystander" (VII R. R. at 225, 245). Michael Rivas gave inconsistent testimony as to who came up to the Expedition when it parked at the house at 1406 12th Street (VII R. R. at 257). He could not testify that Felix Flores had anything in his hand when he approached the vehicle, if he was swinging in the vehicle or if he even said anything (VII R. R. at 258).

The appellant testified that he was at the party at Cedar Street with Michael Rivas on October 14, 2011, and that at some point Michael left with Adriana Benavides (VIII R. R at 47-48). When Michael Rivas returned, he appeared to have been injured and the appellant wanted to go to his sister's house which is also on Cedar Street to get Michael bandages (VIII R. R. at 49). Instead, they got into the black Expedition and took off driving. The appellant testified that Michael Rivas did not want to go to the appellant's house on 10th Street (VIII R. R. at 50). At some point while they were driving around, they stopped at the victims' house at 1406 12th Street

9

and that is when Felix Flores approached the Expedition and started swinging at him (VIII R. R. at 51-52). Because Felix Flores was swinging at him, the appellant grabbed his handgun which was between the seat and the console and began shooting at Felix Flores (VIII R. R. at 52-54). The appellant also testified that he put the weapon outside of the window to shoot Felix Flores (VIII R. R. at 78). The appellant testified that Felix Flores was right up against the vehicle when the appellant shot him (VIII R. R. at 77). The appellant admitted to carrying a gun constantly despite not having a concealed hand gun license (VIII R. R. at 58).

The testimony of the medical examiner was that there were nine (9) gunshot wounds to Felix Flores's body. The fatal wound was gunshot "A" which was to his right ear, traveled down the base of his skull and cut the spinal cord. This wound would have caused Felix Flores to drop to the ground where he was standing and incapacitate him. Felix Flores would have been unable to move after this wound (V R. R. at 16, 27, 45). There was no evidence of stripling on Felix Flores (V R. R. at 18). Gunshot "A" was fired more than two to three feet away from the body (V. R. R. at 41). Gunshot wound "G" entered Felix Flores's body from the rear while he was turning away from the shooter (V R. R. at 47). Felix Flores was 5' 7" and weighed 315 pounds was considered morbidly obese (V R. R. at 20). At the time of death, he had a blood alcohol level of .122 and had three prescription depressant drugs, methadone, tramadol, hydrocodone, in his system. Felix Flores had previously had a botched hemorrhoid surgery sometime in 2011 and an enlarged heart condition (IV R. R. at 113, 176, V R. R. at 20-21, 41, VII R. R. at 154-155). The array of gun shots on the body would support the scenario that the shooter was sitting still while the victim was turning around trying to avoid being shot (V R. R. at 32-33). The cause of death was multiple gunshot wounds and the manner of death was homicide (V R. R at 50).

The evidence of the appellant carrying a gun in anticipation of an attack undermines his claim for sudden passion. Anticipating an event and preparing yourself to respond to the occasion demonstrate a person possessed with cool reflection. *McKinney v. State,* 179 S. W. 3d 565, 570 (Tex. Crim. App. 2005) *citing Gonzales v. State,* 717 S. W. 2d 355, 357 (Tex. Crim. App. 1986). The appellant's contention that he was operating under fear for his brother's safety due to the previous altercation on 18th Street and because he was trying to get "his brother cleaned up," does not rise to the level of terror, anger, rage, or resentment. Any emotion that the appellant felt as a result of his brother's previous altercation and injuries cannot be the basis for an adequate cause to give to rise to an immediate influence of sudden passion. *See Id., Hobson v. State,* 644 S. W 2d 473, 478 (Tex. Crim. App 1983).

Since the appellant did not know that Felix Flores was the individual that had allegedly previously attacked his brother, he cannot claim to be in an emotional state of terror, anger, rage or resentment of Felix Flores.

Adriana Benavides yelling "look out" may have startled the appellant; however, this is not evidence that the appellant acted under the immediate influence of passion such as terror, anger, rage, resentment; or that this sudden passion was in fact induced by some provocation by the deceased or another acting for him and that the appellant committed the murder before he could regain his cool reflection and that there existed a causal connection between the provocation and the homicide. Rather at the most, this is evidence of a "bare claim of fear" which does not rise to the level of terror which necessitates a sudden passion jury instruction. *Wooten v. State,* 400 S. W. 601, 605-607 (Tex. Crim. App. 2013).

11

If the appellate court finds that no harm was suffered by the appellant because the trial court failed to charge the jury with respect to sudden passion, then the harm analysis is dispositive and there is no need to address the issue of error on the part of the trial court. *Id.* at 607.

The primary challenge to the appellant's issue of the lack of sufficient evidence to convict the appellant on the charge of criminal conspiracy to commit murder is the lack of accomplice testimony. There exists, however, ample evidence that despite the appellant's denial of an agreement to commit murder, the appellant and Michael Rivas entered into such an agreement. The evidence that exist is that the parties engaged in a conversation prior to the act that they were going to go look for Felix Flores, that the appellant was going to prove himself to his brother and that they were not going to let anyone "fuck" with them.

Perjury is committed by making a deliberate and willful false statement under oath. *In Re Davila,* 631 S. W. 2d 723, 725 (Tex. Crim. App. 1982), *Farrakhan v. State,* 263 S. W. 3d 124, 131 (Tex. App. – Houston [1st Dist.] 2006, no pet.) A person commits the offense of perjury if, with intent to deceive and with knowledge of the statement's meaning, he makes a false statement under oath. *Id.* There has been no evidence offered by the appellant for which the state can rebut that the cited statements were made with the intent to deceive and furthermore, that the state failed to correct unsolicited perjured testimony. There was no evidence presented at the trial court or in the appellant's brief that any of the witnesses cited had previously given contradicted testimony and that the state failed to cure that contradiction. *See id.* Rather, the gist of the appellant's complaint is that the prosecutor made a statement in closing that the evidence established that the deceased was a member of the Mexican Mafia and that this statement was contrary to trial strategy and tactics. Appellant's assertion is contrary to the state's opening

12

argument and acquiescence that the evidence would be that both Michael Rivas and the victim, Felix Flores, were members of the Mexican Mafia.

There was evidence provided by each of the witnesses cited by the appellant that was also favorable to the appellant, therefore, there can be no demonstration of misconduct on the part of the state. *Grismore v. State,* 641 S. W 2d 593-595 (Tex. App. – El Paso 1982, no writ) *criticized on other grounds, Werner v. State*, 680 S. W. 2d 858 (Tex. App. – Houston [1st Dist.] 1984), *aff'd in* 711 S. W. 2d 639 (Tex. Crim. App. 1986).

If this Court holds that the testimony cited by the appellant was in fact perjured testimony it can be established beyond a reasonable doubt that the testimony did not contribute to the conviction or the punishment. Given that the state alluded to the deceased's association with the Mexican Mafia both in its opening and closing statement and agreed to the admission of evidence which buttressed this assertion, it can be concluded that the jury had ample evidence that Felix Flores was a member of the Mexican Mafia when it rendered its verdicts.

The state would argue that the trial court exercised its wide discretion and properly excluded any testimony as to if Sergeant Valenzuela had ever stopped the appellant and Juliana Jasso due to the testimony of Sergeant Valenzuela and Juliana Jasso that they had ended their relationship in 2005, six years before the incident. Any evidence as to any bias on the part of Sergeant Valenzuela would have been too remote. *See Turner, Collie & Braden, Inc., v. Brookhollow, Inc.,* 624 S. W. 2d 203, 209 (Tex. App. – Houston [1st Dist. 1981), *aff'd in part and rev'd in part on other grounds,* 642 S. W. 2d 160 (Tex. 1982).

Additionally, it cannot be said that the trial court abused her discretion in refusing to allow this testimony. Sergeant Valenzuela testified as to his involvement with Juliana Jasso, the ex-girlfriend of the appellant, that he was not the officer who actually retrieved the casings at the

crime scene. The appellant himself corroborated the statement of Adriana Benavides that he was the individual who shot Felix Flores. Any error was waived by the introduction of similar evidence by the appellant. *Hanner v. State,* 572 S. W. 2d 702, 707 (Tex. Crim. App. 1978).

Furthermore, the state addressed the issue of Sergeant Valenzuela's connection with the witness, Juliana Jasso; therefore, there was ample evidence already in the record of which the jury may have considered that Sergeant Valenzuela was biased, if at all, toward the appellant. Additional evidence of bias was properly excluded. *Gilstraip, v. State,* 945 S. W. 2d 192, 196 (Tex. App. – Fort Worth 1997, writ ref'd ).

Any error that might have been committed in restricting the cross-examination of Juliana Jasso was harmless beyond a reasonable doubt. *Id. See Rovinsky v. State,* 605 S. W. 2d 578, 580 (Tex. Crim. App. 1980).

<u>RELEVANT CASE LAW AND ARGUMENT</u>

<u>ISSUE NUMBER ONE</u>

**THE TRIAL COURT DID NOT ERR IN DENYING THE APPELLANT'S REQUEST FOR A JURY CHARGE ON SUDDEN PASSION DURING PUNISHMENT**

<u>ARGUMENT AND AUTHORITIES</u>

<u>Evidence of Sudden Passion</u>

The appellant did not make a request for a sudden passion jury instruction, but only adopted the request by Michael Rivas for a jury charge of sudden passion in the court's charge pursuant § 19.02 (d) of the Texas Penal Code (X R. R. at 3). Tex. Penal Code Ann. § 19.02 (d) (Vernon 2011). This request was objected to by the state and denied by the trial court (X R. R. at 3).

If a murder is committed under the immediate influence of sudden passion arising from an adequate cause then the punishment is reduced from a first degree felony to a second degree felony. Tex. Penal Code Ann. § 19.02 (d) (Vernon 2011). Sudden passion is "passion directly caused by and arising out of the provocation by the individual killed" which arises at the time of the murder. Tex. Penal Code Ann. § 19.02(a) (2) (Vernon 2011). Adequate cause is a "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." Tex. Penal Code Ann. § 19.02 (a)(1) (Vernon 2011).

To justify a jury instruction on the issue of sudden passion, the record must at least minimally support an inference that: 1) murder defendant in fact acted under the immediate influence of a passion such as terror, anger, rage, or resentment; 2) his sudden passion was in fact induced by some provocation by the deceased or another acting with him, which provocation would commonly produce such a passion in a person of ordinary temper; 3) he committed the murder before regaining his capacity for cool reflection; and 4) a causal connection existed between the provocation, passion, and homicide. *Wooten v. State,* 400 S. W. 3d 601, 605 (Tex. Crim. App. 2013).

The defendant has the burden of production and persuasion with respect to the issue of sudden passion. *Id.*

It does not matter not matter that the evidence supporting the submission of sudden passion instruction may be weak, impeached, contradicted, or unbelievable. *Id.* If the evidence raises the issue from any source, during either the guilt-innocence or the punishment stage of the trial, the defendant has satisfied his burden of production and the trial must submit the issue in the jury charge upon the defendant's request. *Id.*

If the appellate court finds that no harm was suffered by the appellant because the trial court failed to charge the jury with respect to sudden passion, then the harm analysis is dispositive and there is no need to address the issue of error on the part of the trial court. *Id.* at 607.

The appellant states in his brief that Michael Rivas testified that Felix Flores assaulted the appellant and this is some evidence to support the claim that the appellant acted due to provocation. Appellant's brief at 18. This not the testimony from Michael Rivas. Michael Rivas refused to state that Felix Flores assaulted the appellant (VIII R. R at 258). He instead testified that they had gone for a cruise, that the appellant was "concerned" for Michael's injuries and that he could not state that Felix Flores was swinging in the Expedition (VII R. R. at 254, 256-259).

The appellant also states that since the testimony was that Felix Flores put his hands in the air at the time the appellant and Michael Rivas drove up in front of Johnny Joe Flores's house that this gesture can be viewed as threatening and causing provocation. Appellant's brief at 18.

Evidence of provocation, although a requirement for a sudden passion charge, alone, is insufficient to show that the appellant was under the immediate influence of sudden passion. *McKinney v. State,* 179 S. W. 3d 565, 570-571 (Tex. Crim. App. 2005).

The appellant also testified that he carried a weapon with him all times because he had previously been attacked by the enemies of Michael Rivas and he was in fear for his safety (VIII R. R. at 53, 57). Appellant's brief at 17. Evidence of the appellant carrying a gun in anticipation of an attack undermines his claim for sudden passion. The Court of Criminal Appeals has held that anticipating an event and preparing yourself to respond to the occasion demonstrate a person possessed with cool reflection. *McKinney v. State,* 179 S. W. 3d 565, 570 (Tex. Crim. App.

16

2005) *citing Gonzales v. State,* 717 S. W. 2d 355, 357 (Tex. Crim. App. 1986). It appears that the appellant had time to consider how to deal with the situation and by carrying a gun he was preparing himself to deal with the enemies of his brother, Michael Rivas, and can be said to have operated under "cool reflection."

The appellant states in his brief that he was operating under fear for Michael Rivas's safety due to the previous altercation on 18th Street and because he was trying to get "his brother cleaned up." Appellant's brief at 17. However, this is not evidence that the appellant acted in such a way as to express terror, anger, rage, or resentment. Any emotion that the appellant felt as a result of his brother's previous altercation and injuries cannot be the basis for an adequate cause to give to rise to an immediate influence of sudden passion. *See McKinney v. State,* 179 S. W. 3d 565, 570 (Tex. Crim. App. 2005), *Hobson v. State,* 644 S. W 2d 473, 478 (Tex. Crim. App 1983). Any passion experienced by the appellant because of the previous altercation and Michael Rivas's injuries did not arise at the time of the actual shooting. *Id.*

In fact, this not even evidence that the appellant acted in fear. The appellant testified that he was shocked to see Felix Flores at the corner of Avenue P and 12th Street, not that he was fearful, or in terror, or angry or resentful, just that he was shocked (VIII R. R. at 50, 52). The appellant testified that he did not even know that Felix Flores was the individual who had previously attacked his brother (VIII R. R. at 69). If the appellant did not know that Felix Flores was the individual that had allegedly previously attacked his brother, he cannot claim to be in an emotional state of terror, anger, rage or resentment of Felix Flores. The appellant testified that he just wanted to go to his sister's house to bandage up Michael Rivas (VIII R. R. at 49). The appellant then testified that after Felix Flores swung one time through the passenger window of the vehicle, he placed his firearm outside of the window of the vehicle and fired it at Felix Flores

17

(VIII R. R. at 78). The state would argue that placing a gun "outside" the window is not a reflexive act, rather an intentional act. The appellant's assessment of the situation refutes the claim that he lacked the ability for cool reflection. *See Wooten* at 607 (*citing Daniels v. State, supra,* at 461).

Even if the Court believes that by Adriana Benavides yelling "look out" that this startled the appellant, this is not evidence that the appellant acted under the immediate influence of passion such as terror, anger, rage, resentment; or that this sudden passion was in fact induced by some provocation by the deceased or another acting for him and that the appellant committed the murder before he could regain his cool reflection and that there existed a causal connection between the provocation and the homicide. *Wooten v. State,* 400 S. W. 3d at 605. Rather at the most, this is evidence of a "bare claim of fear" which does not rise to the level of terror which necessitates a sudden passion jury instruction. *Id.* at 607.

Additionally, there was evidence that the appellant and Michael Rivas had time for cooling off and considerations of other opportunities prior to the incident. For example, the appellant and Michael Rivas had enough time and thought process to evade the police by faking a visit to a friend of Adriana Benavides (VIII R. R. 254-255). This is evidence of a cool reflection period prior to the incident.

The post-shooting activities of the appellant are also evidence that the appellant acted intentionally and knowingly and without provocation as to his conduct of shooting Felix Flores. The evidence is that after the shooting the appellant did not attempt to contact law enforcement, did not seek medical treatment for Michael Rivas, did not seek medical treatment for himself, did not seek medical treatment for Felix Flores, did not stay at the location to see the extent of the injuries of Felix Flores or Johnny Joe Flores, nor did he attempt to inquire if the two females that

18

were outside of the home were injured or needed any assistance or if there were any other victims at the house. Instead, the appellant fled the crime scene, was dropped off at his house where he then ran away, he discarded the weapon, he then called an ex-girlfriend to pick him up and drive him to a back road and then meet him in San Antonio were he hid from law enforcement for four (4) days until October 19, 2011 (VIII R. R. at 71-72, 83, 85, 88). The testimony was that the appellant knew he would be "going away" for a long time and he wanted the ex-girlfriend to stay with him in San Antonio (VIII R. R. at 88). The state would argue that these acts undermine the appellant's claim of sudden passion. Just as flight can be considered evidence of guilt; the state would argue that these are the actions of a man with cool reflection to make decisions and act in such a way as to evade legal responsibility and prosecution. *See Samuels v. State,* 785 S. W. 2d. 882, 885 (Tex. App. – San Antonio 1990, writ ref'd.).

The appellant did not express any anger, rage, resentment or terror, only that he was shocked to see Felix Flores when he shot him. His assertion at trial was simply that he shot Flores in self-defense. *Daniels v. State,* 645 S. W. 2d 459, 460 (Tex. Crim. App. – 1983), *Mitchell v. Sate,* 191 S. W. 3d 219, 225 (Tex. App. – San Antonio, pet ref'd).

## Harm Analysis

If the appellate court finds that no harm was suffered by the appellant because the trial court failed to charge the jury with respect to sudden passion, then the harm analysis is dispositive and there is no need to address the issue of error on the part of the trial court. *Wooten* at 607.

In *Wooten*, the Court of Criminal Appeals discussed its analysis in *Trevino v. State* wherein it did not invoke an *Almanza* analysis and instead reviewed the record as a whole. *Id.* at 608 (discussing *Trevino v. State,* 100 S. W. 3d 232 (Tex. Crim. App. 2003) (per curiam)). In

*Trevino*, the Court opined that the jury could have rejected the defendant's self-defense claim and yet still have believed that he killed in the heat of passion, yet it did not discount the possibility that evidence in a case in which a jury rejected a claim of self-defense could demonstrate also that an appellant was not harmed by the failure to receive a sudden passion charge. *Id.* at 609, *Chavez v. State*, 6 S. W. 3d 56, 65 (Tex. App. – San Antonio 1999, pet ref'd).

It is highly unlikely that a jury that had already rejected the appellant's claim that he reasonably believed that deadly force was immediately necessary to defend himself would nevertheless find in his favor on the issue of sudden passion. To establish sudden passion, the appellant would have had to provide 1) that he actually acted under the influence of a fear so great that is caused him to lose his capacity for cool reflection, and 2) that Felix Flores's actions were adequate to produce such a degree of fear in a man of ordinary temperament. *Wooten* at 609. Since, the jury rejected the claim that the appellant reasonably believed deadly force to be immediately necessary, it would be unlikely to believe that, at the time, the appellant first fired, he was actually experiencing a level of fear that caused him to lose control. Even if the jury believed that the appellant subjectively experienced such a level of fear, it would not likely have found Felix Flores's behavior presented a provocation adequate to produce such a degree of fear in a man of ordinary temperament. *Id.*

The state would argue that based on the record and evidence, it is exceeding unlikely that the appellant suffered "some harm" as a result of the trial court's failure to give the jury a sudden passion instruction based on the appellant's assertion that he shot because he was shocked to see Felix Flores at the window of the Expedition and because he was in fear for his brother. Shock and fear for his brother who was not in any immediate danger are not grounds for adequate cause.

20

**THE EVIDENCE IS SUFFICIENT TO SUPPORT CONVICTION
FOR CONSIRACY TO COMMIT MURDER**

**ARGUMENT AND AUTHORITIES**

The Court reviews the sufficiency of evidence challenges applying the same standard of review, regardless of whether an appellant presents the challenge as a legal or factually sufficiency challenge. This standard of review was enunciated in *Jackson v. Virginia. Jackson v. Virginia,* 443 U. S. 307, 319 (1979). The inquiry on review for legal sufficiency is whether, after viewing the evidence in a light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Powell v. State,* 194 S. W. 3d 503, 506 (Tex. Crim. App. – 2006). The sufficiency of the evidence standard gives responsibility to the fact finder to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic to ultimate facts. *See Jackson v. Virginia,* 443 U.S. 307, 319 (1979). *Clayton v. State,* 235 S. W. 3d 772, 778 (Tex. Crim. App. – 2007). An appellate court presumes that the fact finder resolved any conflicts in the evidence in favor of the verdict and defers to that resolution, provided that the resolution is rational. In viewing the record, direct and circumstantial evidence are treated equally; circumstantial evidence is a probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Clayton* at 778. The "cumulative force" of all the circumstantial evidence can be sufficient for a jury to find the accused guilty beyond a reasonable doubt. *See Powell v. State,* at 507. In a circumstantial evidence case, it is unnecessary for every fact to point directly and independently to the guilt of the accused; rather it is enough if the finding of guilt is warranted by the cumulative force of all the incriminating

21

evidence. *Id.* at 507. A reviewing court is permitted to consider all evidence in the trial-court record, whether admissible or inadmissible when making a legal-sufficiency determination. *Id.*

The evidence can be held to be insufficient under the *Jackson* standard in two circumstances: 1) the record contains no evidence, or merely a "modicum" of evidence, probative of an element of the offense, or 2) the evidence conclusively establishes a reasonable doubt. *See Jackson v. Virginia* at 314, 318.

The elements of criminal conspiracy applicable to this case are: 1) intent that a felony be committed, 2) agreement with one or more persons that one or more of them engage in conduct that would constitute the felony offense; and 3) that the appellant or one or more of the co-defendants perform an overt act in pursuance of the agreement. Tex. Penal Code Ann. § 15.02 (a) (Vernon 2011). An agreement constituting a conspiracy may be inferred from the acts of the parties. Tex. Penal Code Ann. § 15.02 (b) (Vernon 2011).

While the accused's mere presence in the company of the accomplice before, during, and after the commission of the offense is insufficient to show guilt, evidence of such presence, coupled with outer suspicious circumstances, may tend to connect the accused to the offense. *Jacskon v. Virgina,* at 318, *See Dowthitt v. State,* 931 S. W. 2d 244, 249 (Tex. Crim. App. – 1996), *Cox v. State,* 830 S. W. 2d 609, 611-612 (Tex. Crim. App. – 1992).

The primary challenge to the appellant's issue is the lack of accomplice testimony. Appellant's brief 21-22. The appellant would have this court reverse the jury verdict because the appellant did not readily submit that he agreed to conspire with Michael Rivas or Adriana Benavides to commit the offense of murder. It stands to reason that the parties would deny such an allegation.

In the instant case, the evidence of the conspiracy is:

22

1. The co-defendant, Adriana Benavides, pled no contest to the offense criminal conspiracy and was sentenced to 4 years confinement in the Texas Department of Corrections with a suspended sentence (VII R. R. at 107).

2. Adriana Benavides and Michael Rivas went to 18th street to discuss the complaint of Adriana steeling $300 worth of cocaine with a fellow member of the Mexican Mafia (VII R. R. at 10, 222-223, 247).

3. It was common knowledge that a number of people lived at the house on 18th Street across from the park and that a number of people congregated there including members of the Mexican Mafia (VIII R. R. at 110, 223).

4. Michel Rivas and Adriana Benavides went to 18th Street anticipating an altercation between members of the Mexican Mafia and Michael Rivas because he had been called a "bitch" and a "pussy" by Chevio Luna (VII R. R. at 10, 222-223, VIII R. R. at 11-13).

5. At some point, Felix "Chape" Flores, drove up and got off a white van (VII R. R. at 40). A fight then ensued between Michael Rivas and Felix Flores and a number of additional males.

6. After the fight was over, Michael Rivas took off running and Adriana Benavides then drove after Michael Rivas and picked him up about a block away from the location of the fight (VII R. R. at 17, 44).

7. Michael Rivas and Adriana Benavides returned to the party at Cedar Street and waited there until the appellant returned to the party (VII R. R. at 19). Once the appellant returned to the party on Cedar Street, Michael Rivas told the appellant about the fight on 18th Street (VI R. R. at 227-229).

23

8. Michael Rivas and the appellant engaged in a conversation regarding the incident at 18th Street and Michael Rivas was heard to say to the appellant "If you're down to roll, let's ride" (VI R. R. at 264-265). The appellant responded by saying "Fuck them. I already told these mother fuckers they are not going to fuck with us. Fuck that bro, Fuck that shit. I am tired of their shit" (VI R. R. at 228, 265-266). The testimony was also that Michael Rivas told the appellant "Fuck that. Let's go get them" (VI R. R. at 266).

9. Michael Rivas, Adriana Benavides and the appellant then got into the black Expedition wherein the appellant had his gun and left the house on Cedar Street (VIII R. R. at 234, VIII R. R. at 56-57). The evidence is that they remained in the same seats when they drove up to 1406 12th Street (IV R. R. at 35-36, VII R. R. at 234, 151).

10. The appellant was in the front passenger seat (VI R. R. at 255, VII R. R. at 234).

11. The gun was heard to have been racked while at Cedar Street (VI R. R. at 253).

12. After leaving Cedar Street, Michael Rivas, Adriana Benavides and the appellant drove down 11th Street where they saw a police officer. Michael pulled into a driveway and Adriana Benavides got off the car and pretended to be visiting someone at a house on 11th Street in an effort to evade the police (VII R. R. at 14, 22-24, 234, 246-247, VIII R. R. at 14).

13. While they were stopped at this residence, the appellant told Michael, "I'm going to make you a believer" (VII R. R. at 22).

14. Before arriving at 1406 12th Street, the appellant told Michael Rivas that he "might know where the guy (Felix Flores) would be" (VII R. R. at 91).

24

15. The testimony was that when the black Expedition drove up, a male voice was heard saying "That's him" (IV R. R. at 97, 190).

16. The appellant pointed his weapon outside of the vehicle and fired at Felix Flores (IV R. R. at 36, 167, 192-193, VII R. R. at 27, 149, 185, VIII R. R. at 78).

17. After the shooting, the parties drove to the appellant's mobile home on 11th Street. Appellant and Michael Rivas both exited the vehicle (VII R. R. at 243).

18. Michael told Adriana Benavides to drive off and she refused to do it. It was only after Michael and the appellant ran off did she get back into the vehicle and then drove to her home (VII R. R. at 29).

19. At all times, Adriana Benavides was with Michael Rivas and the appellant of her own free will and never made any attempt to get away from the appellant and his brother (VII R. R. at 11, 50).

20. Once the appellant arrived to his house on 10th Street, he ran away, discarded the weapon, he then called an ex-girlfriend, Juliana Jasso, to pick him up and drive him to a back road and then meet him in San Antonio were he hid from law enforcement for four (4) days until October 19, 2011 (VIII R. R. at 71-72, 75, 83, 85, 88). The testimony was that he knew he would be "going away" for a long time and he wanted the ex-girlfriend to stay with him in San Antonio (VIII R. R. at 88).

21. The appellant admitted to carrying a gun with him constantly despite not having a concealed hand gun license because he had previously been assaulted by enemies of Michael Rivas (VIII R. R. at 56, 58).

22. The appellant was with Michael Rivas at a party drinking even though his brother had just been released from the Texas Department of Corrections Substance Abuse Facility (VIII R. R. at 6-7).

23. The appellant was in violation of his pre-trial release agreement by consuming an alcoholic beverage and carrying around a weapon without a concealed handgun license and in violation of § 46.02 of the Texas Penal Code (VIII R. R. at 80).

24. Michael Rivas nor the appellant ever sought medical treatment for any of the injuries they allege they sustained from the deceased, from Felix Flores (VII R. R. at 34-34, 94, 255, VIII R. R. at 233).

Despite the appellant's denial of an agreement to commit murder, there in fact existed ample evidence that the appellant and Michael Rivas entered into such an agreement.

A reviewing court may consider the events before, during, and after the commission of the offense. *See Powell v. State,* at 507. Sufficient corroboration may be furnished by the suspicious conduct of the accused such as flight after the crime was committed. *Cawley v. State,* 310 S. W. 2d 340, 342 (Tex. Crim. App. 1957), *cert. denied,* 361 U. S. 920 (1959). Flight has long been deemed indicative of consciousness of guilt. *Id.* Any conduct on the part of a person accused of a crime, subsequent to its commission, which indicates a consciousness of guilt may be viewed as a circumstance tending to prove that he committed the act with which he is charged. *Cueva v. State,* 339 S. W. 3d 839, 881-882 (Tex. App. – Corpus Christi 2011, pet. ref'd). Such evidence can be considered circumstantial evidence indicating consciousness of guilt on the part of the accused and "consciousness of guilt" is perhaps one of the strongest kinds of evidence of guilt. *Id., Torres v. State,* 794 S. W. 2d 596, 598 (Tex. App. - Austin 1990, no pet.).

26

**ISSUE NUMBER THREE**

**THE STATE DID NOT USE PERJURED
TESTIMONY TO CONVICT APPELLANT**

**ARGUMENT AND AUTHORITIES**

The appellant's third issue centers on the testimony of several witnesses that to their personal knowledge the deceased, Felix Flores, was not a member of the Mexican Mafia and the closing statement of counsel that Felix Flores was a member of the Mexican Mafia. Appellant's brief at 24. The appellant fails to apprise this court, that the state, in its opening statement, stated that the evidence would show that the deceased, Felix "Chape" Flores, was a member of the Mexican Mafia (IV R. R. at 20).

The appellant specifically cites the testimony of Johnny Joe Flores, Janie Aguilar, Margie Gonzales, Sergeant Brian Valenzuela and Officer Ramiro Guedea.

Appellant states that Johnny Joe Flores denied knowing anything about the Mexican Mafia and denied knowing any members of the Mexican Mafia and that this testimony was a lie. Appellant's brief at 24.

Johnny Joe Flores was asked if he knew anything about the Mexican Mafia and he stated that he did not (IV R. R. at 72-73). There was no evidence presented that Johnny Joe Flores's testimony was perjured testimony either in the trial court or in the appellant's brief. In fact, when asked if he knew if Michael Rivas was a member of the Mexican Mafia, Johnny Joe Flores stated that he "had no idea" (IV R. R. at 75). Even though Michael Rivas admitted to being a member of the Mexican Mafia, there was no evidence presented that Johnny Joe Flores lied when he stated that he had no idea that Michael Rivas was a member of the Mexican Mafia (VII R. R. at 215).

27

Appellant states that Janie Aguilar testified that she never knew Felix Flores to be in the Mexican Mafia. Appellant's brief at 24.

Janie Aguilar was asked if she knew Felix Flores to be a member of the Mexican Mafia and if she knew anything about the Mexican Mafia and she stated "no" to both inquiries (VII R. R. at 156). There was no evidence presented that Janie Aguilar's testimony was perjured testimony either in the trial court or in the appellant's brief. In fact, when asked if she ever had conversations about the Mexican Mafia with Felix Flores, Janie Aguilar agreed with the appellant's trial counsel's assertion that Felix Flores and her never "really talked about that kind of stuff" (VII R. R. at 189).

Appellant states that Margie Gonzales lied when she testified that her husband, Johnny Joe Flores, was never a member of the Mexican Mafia, she never had any interaction with anyone affiliated with the Mexican Mafia and that Felix Flores was not a member of the Mexican Mafia. Appellant's brief at 24.

Margie Gonzales was asked if she knew if Johnny Joe Flores was a member of the Mexican Mafia. She replied "no" (IV R. R. at 174). She was also asked if she knew anything about the Mexican Mafia and she stated that she had heard of them, but that she did not really pay attention to that and that she and Felix Flores never engaged in conversations about the Mexican Mafia because it was not something about which she needed to concern herself (IV R. R. at 174, 200-201). There was no evidence presented either in the trial court in the appellant's brief that Margie Gonzales's testimony was perjured testimony. In fact, when asked if she knew if Michael Rivas or the appellant were members of the Mexican Mafia, Margie Gonzales stated that she did not know (IV R. R. at 176). Even though Michael Rivas admitted to being a member of the Mexican Mafia, there was no evidence presented that Margie Gonzales lied when she

28

stated that she had no idea that Michael Rivas was a member of the Mexican Mafia (VII R. R. at 215).

Hondo Police Officer Ramiro Guedea and Sergeant Valenzuela were not qualified to testify that the tattoos on Felix Flores alone were indication of association with the Mexican Mafia (V R. R. at 105-107, VI at 43-55).

Hondo Police Department Sergeant Rick Garza was asked if he knew Felix Flores was a member of the Mexican Mafia (VI R. R. at 169). Sergeant Rick Garza stated that he did not know. There was no evidence present either in the trial court or in the appellant's brief that Sergeant Rick Garza's testimony was perjured testimony. In fact, Sergeant Garza was also asked by the undersigned if he knew if the appellant was a member of the Mexican Mafia and he replied that he did not know (VI R. R. at 169).

The appellant states that the "judge did not allow testimony that the tattoos on Felix's body were indicative of Mexican Mafia." Appellant's brief at 4. This is a misstatement of the record. Sergeant Rick Garza testified that the tattoos on the photographs of Felix Flores indicated association with the Mexican Mafia (IV R. R. at 187-191).

The appellant argues that the "state continuously fought to keep testimony of Felix's gang affiliation from going before the jury." Appellant's brief at 24. This is misstatement of the record. If fact, the state agreed to the admission of defense exhibits numbers 2 through 12 which were photographs of Felix Flores with depictions of his tattoos indicating association with the Mexican Mafia (VI R. R. at 186, 191). In doing so, the state acknowledged that the evidence might show that Felix Flores was a member of the Mexican Mafia as it had asserted in its opening statement.

29

Perjury is committed by making a deliberate and willful false statement under oath. *In Re Davila,* 631 S. W. 2d 723, 725 (Tex. Crim. App. 1982), *Farrakhan v. State,* 263 S. W. 3d 124, 131 (Tex. App. – Houston [1st Dist.] 2006, no pet.) A person commits the offense of perjury if, with intent to deceive and with knowledge of the statement's meaning, he makes a false statement under oath. *Id.* There has been no evidence offered by the appellant for which the state can rebut that the cited statements were made with the intent to deceive and furthermore, that the state failed to correct unsolicited perjured testimony. There was no evidence presented at the trial court or in the appellant's brief that any of the witnesses cited had previously given contradicted testimony and that the state failed to cure that contradiction. *See Farrakhan v. State* at 131-132. Rather, the gist of the appellant's complaint is that the state made a statement in closing that the evidence established that the deceased was a member of the Mexican Mafia.

Given that there was evidence provided by each of the witnesses cited that was also favorable to the appellant, there can be no demonstration of misconduct on the part of the state. *Grismore v. State,* 641 S. W 2d 592, 593 (Tex. App. – El Paso 1982, no writ) *criticized on other grounds, Werner v. State*, 680 S. W. 2d 858 (Tex. App. – Houston [1st Dist.] 1984).

If this Court holds that the testimony cited by the appellant was in fact perjured testimony, it can be established beyond a reasonable doubt that the testimony did not contribute to the conviction or the punishment. Given that the state alluded to the deceased association with the Mexican Mafia both in its opening and closing statement and agreed to the admission of evidence supporting that particular issue, it can be concluded that the jury had ample evidence that Felix Flores was a member of the Mexican Mafia when it rendered its verdicts. *See Celis v. State,* 369 S. W. 3d 691, 697 (Tex. App. – Fort Worth 2012, pet ref'd).

**THE TRIAL COURT DID NOT ERR IN SUSTAINING THE STATE'S "SPECULATION" OBJECTION WHEN APPELLANT ATTEMPTED TO ELICIT TESTIMONY FROM THE WITNESS, JULIANA JASO**

**ARGUMENT AND AUTHORITIES**

Hondo Police Sergeant Brian Valenzuela was the fourth officer on the scene of the murder (V R. R. at 86-87, 126, VI R. R. at 6-11, 144). It was his responsibility to ensure officer safety, the safety of public and to secure the scene (VI R R. at 8). After those responsibilities, he was to close the scene and contact his chain of command along with the detectives, Sergeant Rick Garza and Sergeant Jo Ann Garza which he did (VI R. R. at 8). Sergeant Valenzuela testified that he was told by one of the initial responding officers that there were bullet casings in the area where the EMS unit might be parking. Consequently, Sergeant Valenzuela advised Officer Dunkley to retrieve the casings in order to preserve the evidence (VI R. R. at 11, 52). It was Officer Dunkley and not Sergeant Valenzuela who retrieved the casings from the ground. (VI R. R. at 11, 52). It was after that time that individuals at the scene identified the shooter as the appellant and that he and Michael Rivas had been in a black Expedition (VI R. R. at 13-14). Because Sergeant Valenzuela had knowledge that Michael Rivas was dating Adriana Benavides and he knew her father, Sergeant Valenzuela directed Officer Guedea to travel to her parent's house to try and locate the vehicle (VI R. R. at 14-15). Sergeant Valenzuela testified that he arrived at Adriana Benavides house approximately twenty five (25) minutes later and that Adriana Benavides made an unsolicited statement that she had been with Michael Rivas and the appellant and that the appellant had shot Felix Flores (VI R. R. at 19-20). The appellant buttressed Adriana Benavides's statement when he testified that he shot Felix Flores (VIII R. R. at 53, 78). Sergeant Valenzuela and Juliana Jasso both testified she had two (2) children with

Sergeant Valenzuela and two (2) children with the appellant. Jasso also testified that she picked up the appellant immediately following the shooting. Sergeant Valenzuela testified that he and Juliana Jasso ended their relationship in 2005, that he had primary custody of his children and that Juliana Jasso had visitation (VI R. R. at 24-25, 55, VIII R. R. at 87, 92).

The animus, motive, or ill-will of a prosecuting witness who testifies against the defendant is never a collateral or irrelevant inquiry, and the defendant may show by himself, or by others if necessary, why the witness is unfriendly toward him. *Coleman v. State,* 545 S. W. 2d 831, 833 (Tex. Crim. App. - 1977), *criticized on other grounds,* 825 S. W. 2d 521 (Tex. App. – Dallas 1992).

All facts going or tending to show mental bias, interests, prejudice, or any other motive, or mental state, or status of the witness, which, fairly considered and construed, might even remotely tend to affect his credibility, should be admitted. *Green v. State*, 111 S.W. 933, 935 (Tex. Crim. App. - 1908). There can be no doubt that it is always permissible, in every case where it can be shown by competent evidence, to make proof of the hostile attitude of any witness in respect to any party or any cause before the court. Such evidence is clearly admissible for the purpose of affecting the credibility of witnesses and the weight of their testimony. *Burnett v. State*, 112 S.W. 74, 79 (Tex. Crim. App. 1908).

The appellant's issue is that he was not allowed to question the witness, Juliana Jasso, as to if Sergeant Valenzuela had ever stopped her in the past when she was with the appellant. The state objected as to relevancy and the trial court sustained the objection (VIII R. R. at 97). The appellant's trial counsel then argued that he was trying to establish bias on the part of Sergeant Valenzuela. The state then argued that Juliana Jasso's answer as to any bias on the part of Sergeant Valenzuela would be speculation on her part (VIII R. R. at 97).

32

The appellant need not show what his cross-examination of the witness would have affirmatively established; he must merely establish what general subject matter he desired to examine the witness about during his cross-examination and, if challenged, show on the record why such should be admitted into evidence. *See Holmes v. State,* 323 S. W. 3d, 163, 170 (Tex. Crim. App. – 2009).

The situation at bar is not the same as that where a defendant desires to elicit certain specific, responses from the witness with the allege bias, but is precluded from doing so by the trial court. In the instant case, the record shows that the appellant was not prevented from cross-examining Sergeant Valenzuela as to any bias, ill will, ill feeling, prejudice or animus. In the instant case, the appellant had the opportunity question Sergeant Valenzuela about his bias when he cross-examined him and when he re-cross-examined him (VI R. R. at 49, 62).

The appellant also had the opportunity to cross examine, Adriana Benavides as to if Sergeant Valenzuela fabricated the statement he testified that she made. The appellant also during cross-examination was afforded the opportunity to establish that any conduct on the part of Sergeant Valenzuela could be construed to be acting with bias, ill will, ill feeling, prejudice, or animus. The appellant failed to do that.

It can be argued that beyond a reasonable doubt, the trial court's error if any, in denying the appellant the opportunity to question the witness, Juliana Jasso, as to the bias of Sergeant Valenzuela did not contribute to the appellant's conviction or punishment. *See Celis v. State,* 369 S. W. 3d 691, 697 (Tex. App. – Fort Worth 2012, pet. ref'd).

Although, wide latitude should be given an accused to show any fact which would tend to establish ill feeling, bias, motive, or animus on the part of the witness testifying against the accused, the trial court has considerable discretion as to how and when the bias may be proven

33

and as to what collateral evidence may be used for that purpose. *See Coleman v. State,* 545 S.W.2d 831 (Tex. Crim. App. 1977). The state would argue that the trial court exercised its wide discretion and properly excluded any testimony as to if Sergeant Valenzuela had ever stopped the appellant and Juliana Jasso because Sergeant Valenzuela and Juliana Jasso had ended their relationship in 2005, six (6) years prior to the incident. Thus any evidence as to any bias on the part of Sergeant Valenzuela would have been too remote. *See Turner, Collie & Braden, Inc., v. Brookhollow, Inc.,* 624 S. W. 2d 203, 209 (Tex. App. – Houston [1st Dist. 1981), *aff'd in part, rev'd in part*, 642 S. W. 2d 160 (Tex. 1982).

Additionally, it cannot be said that the trial court abused her discretion in refusing to allow this testimony. The state made no secret of Sergeant Valenzuela's connection with the appellant and the witness, Juliana Jasso, both in the direct examination of Sergeant Valenzuela and in the cross-examination of Juliana Jasso. Sergeant Valenzuela testified as to his involvement with Juliana Jasso, the ex-girlfriend of the appellant and that he was not the officer who actually retrieved the casings at the crime scene. There was ample evidence already in the record of which the jury may have considered that Sergeant Valenzuela was biased, if at all, toward the appellant. Additional evidence of bias was properly excluded. *Celis v. State,* 369 S. W. 3d 691, 697 (Tex. App. – Forth Worth 2012, pet. ref'd), *Gilstraip, v. State,* 945 S. W. 2d 192, 196 (Tex. App. – Fort Worth 1997, writ ref'd ).

The appellant corroborated the statement of Adriana Benavides that he was the individual who shot Felix Flores. Any error was waived by the introduction of similar evidence by the appellant. *Hanner v. State,* 572 S. W. 2d 702, 707 (Tex. Crim. App. 1978).

34

Any error that might have been committed in restricting the cross-examination of Juliana Jasso was harmless beyond a reasonable doubt. *See Rovinsky v. State,* 605 S. W. 2d 578 (Tex. Crim. App. 1980), *Celis v. State*, at 697.

## **PRAYER**

For these reasons, **STATE OF TEXAS,** Appellee, requests that this Honorable Court to affirm the decision of the trial court. The Appellant requests any other relief to which it may be justly entitled.

Respectfully submitted,

**DANIEL J. KINDRED**
**38TH JUDICIAL DISTRICT ATTORNEY**
**MEDINA COUNTY, TEXAS**
3102 Avenue G
Hondo, Texas 78861
Telephone: (830) 741-6188
Facsimile: (830) 741-6033

By: */s/ Christina Busbee*
**CHRISTINA BUSBEE**
State Bar No. 00797819
**ASSISTANT DISTRICT ATTORNEY**

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the **APPELLEE'S BRIEF** was served on **DAYNA L. JONES, LAW OFFICE OF DAYNA L. JONES** at **206 E. LOCUST STREET, SAN ANTONIO, TEXAS 78212,** via electronic mail, at **daynaj33@gmail.com,** on December 28, 2014**.**

*/s/ Christina Busbee*
CHRISTINA BUSBEE

35